We are going to hear argument today in two consolidated cases, City of Portland v. the United States and Sprint Corporation v. the FCC. As the parties know, we have divided that argument into two segments based on the subject matters of the petition for review. The first argument will address the petitions for review of the moratorium and the small sale orders, which are at issue in both the City of Portland and the Sprint cases. And the second argument will be the petitions for review of the regulations announced and what the parties have referred to as the utility pull attachment order. We are going to have 40 minutes per side in the first case, 15 minutes on the second. The parties have helpfully indicated the amount of time they need and how they have divided it, and the court has agreed to that. Petitioners in the first case will have time for rebuttal, same in the second, and it's your job to maintain the clock and to reserve your time. So without further ado, we'll hear arguments in the petitions on the moratorium and the small sale order, and Mr. Von Eaton, you may proceed. May it please the court, I will address the general objections of local government petitioners to the moratorium and small sale orders. My co-counsel will address, respectively, the public power objections to the order and the RF objections to the order. So let me begin by calling your attention to the streetlights owned by the city in the right-of-way just outside this courthouse. Very decorative poles with a little bulb on top, I'm sure you've seen them many times. Under the order as issued by the FCC, if a carrier told the city, we want to replace that light and put in something that's a small sale, meaning it could be up to 50 feet high and it could have a 28 cubic foot attachment to it, the city would not be able to say, we don't allow attachments on these poles. That would violate the moratorium order. It would have to accept the application, and then it would have to begin to apply the FCC's rules. It couldn't ask the carrier, can you go somewhere else? It wouldn't have to investigate alternatives, and it wouldn't even have to show that it actually needs the facility. Maybe I misunderstood what you said. Was the request to replace the pole or to add an attachment to it? To replace the pole. The FCC order functions exactly the same either way. In fact, in most cases, the record from Howard County showed, I think it's HLGER703, you almost always have to replace light poles because they aren't designed to hold small cells. The effect is to actually require the replacement of the pole with something new up to 35 feet, and you can't say, could you look at the parking lot across the street where the U.S. government has very large street lights of a very different design, or can you look at putting it on the building, this courthouse or the Shakespeare Club right next door? You wouldn't be able to, those are not germane to considering whether they're entitled to take out the city pole and replace it with something else. The city is going to have to respond, and at the end of the day, if that street light is replaced, it gets a total of $270 per year unless it agrees to, unless it conducts a cost study. In the cost study, you're only going to be able to think about things, the FCC order suggests you get to think about things like maintenance costs, but the costs in terms of lost property values along the street, and the city does own several, as I'm sure you're aware, owns a lot of the properties on the street, that would be lost forever. If you move down the road to where the Rose Bowl Parade is going, Pasadena every year has a moratorium that applies to all construction on the Rose Bowl Parade route and the surrounding streets that runs from basically November to January for the obvious reason that they have to build the grandstands to handle between 700,000 and 1.8 million people coming in. Under the FCC order, because that is an express statement you can't build during that time, that is an express prohibition. Under the FCC rule for moratorium, it's deemed to prohibit and the city would essentially have to accept and approve applications for construction during that time period. It wouldn't have a basis because the FCC also says this has refusing to take permits or process permits for that period. You can't defend that as a reasonable management of the rights of life. Ultimately, the scenarios I've laid out for you are things we think can't be squared with the plain language of the law, which is intended to preserve local authority over the placement of wireless facilities with certain exceptions. What was the FCC's response when you made these points during the administrative process? We did raise the issues about streetlights and the problems of streetlights. Howard County raised them very specifically. Basically, we think they never really considered those issues. During the moratorium proceeding, we raised arguments about the moratorium and said you can't possibly mean to reach things like this, but your definition is overly broad. We raised that in connection with Myrtle Beach, South Carolina, which submitted material saying, look, we close down roads. We don't allow construction during hurricane season on the roads because if we need to get people out, we can't afford to have the roads torn up. The FCC said, no, it's a prohibition. That's it. I suggest we make four basic errors. Some of the points you're making, this is essentially a facial challenge. Some of the points you're making might end up having some merit in an as-applied challenge with respect to a particular jurisdiction. With all due respect, we may be able to raise it, but as you know, the FCC and many people actually contend that the Hobbs Act requires us to raise our issues now. The question is whether they've defined the standards well enough to distinguish between things that are permissible and things that aren't permissible. I don't think they have. I don't think they've done that for purposes of effective prohibition. I don't think they've done that for purposes of aesthetics, and they certainly haven't done it for purposes of moratorium. So for this order to be valid as a rule of law, and that's the idea, this is supposed to have the force of law, it needs to be clearly defined. It needs to have limiting standards. That's the Iowa Utilities case involving AT&T, and this case really doesn't have limiting facilities. It has too many cases that fall off that basically make no sense. And I think that's because it made four basic flaws. The first flaw is I think it applied the wrong definition of effective prohibition. This circuit en banc has ruled that the plain language requires that to be a violation of either 253A or 332C7, the action must actually have the effect of prohibiting or must directly prohibit, that is, facially prohibit. The FCC didn't apply an actual prohibition standard in adopting these rules. And you can actually see that pretty clearly in the aesthetics discussion where the FCC basically says, look, if they have to learn all the local rules and the local rules, even if they're fine for everybody else, everybody else lives under the zoning rules, if those standards might be confusing to these folks, that imposes cost, therefore they're prohibited. But their own case, California Payphone, and, of course, your Ninth Circuit case, don't allow mere cost to rise to the level of prohibition. The same thing with the moratorium. The FCC never considers whether someone can plan around the Rose Bowl parade, which, of course, they can. They simply assume that any delay in any way reflecting the permitting process is going to be a prohibition. So we think that failure, the failure to apply the standard that this court adopted en banc based on plain language, requires that the decision be vacated and sent back to the commission for determination to see whether it would come to similar conclusions if it applied the correct standard. Your position is that our decision in Sprint precludes the application of a materially impeded standard? Obviously, once you move away from the word prohibition, which has a pretty well-defined dictionary meaning, I think, once you move away from that to use sort of synonyms, you can get into a very confusing question about whether they're actually looking at actual prohibitions or not. In the California Payphone case, they said what we mean by materially inhibited isn't cost or increase, we mean that it makes the service non-viable. In the current case, that's not what they're saying. They literally define materially inhibited meaning we prevent the operator from putting in the facilities of the type it wants with the functional characteristics it wants and the time it wants. So essentially, we're prohibiting if we put a burden on the operator doing what it wants. And that can't possibly be squared with the intent of the law, which every court has recognized is intended to preserve zoning authority and allow us to say no sometimes. And zoning for not just these folks but for everyone often results in folks having to change their plans, maybe design things differently, maybe do it at a different location. It always involves, by definition, some inconvenience because of the process you go through. So we don't think Congress could have intended or would have thought if they were letting zoning apply that they were intending to prevent communities from saying no or preventing them from saying you can't go in certain places because of the character of the neighborhood unless you can really show that there is a prohibition on the service. And that I think the FCC hasn't tried to do. The same thing is true with the fees above cost. They basically assume that if fees are in excess of cost, that will result in a prohibition. What's the mechanism for challenging that? So if a city thinks that they've got costs above the 270 annual limit, what's the mechanism for the city to do that? Where does it bring the action? Well, that's a good question because I presume what would have to happen is the city would have to deny for a failure to pay costs that they impose. And then when you went to court, the way the decision works is it assumes that if it's above cost, it's a prohibition, and then the locality has to show that it's cost actually exceeds the limit. How does the city get into court? So if the city of Los Angeles said, look, it's really $400 per poll per year, not 270, that's worth litigating over, where does the city go? They go to the FCC or they have to go into federal court? So I think they would have to go to court because 253D doesn't allow the FCC to decide what right of location. So what's the cause of action? Well, it's a good question because we don't have a cause of action. Whether the city can get an interim relief to get sort of a declaratory ruling. A declaratory ruling on what? That's my problem. I don't see until there's an actual application pending under the FCC shot clock. Your understanding is the FCC is not contemplating that these cost questions will come to the FCC. I think the FCC contemplates that a carrier could come to them and ask them to decide this under 253D, and the structure of Section 253 seems to suggest that a supremacy clause-type claim could be brought in court by the provider under 253D, arguing that the city's fees that it's refusing to pay are prohibitory and not saved by 253C or 332. Can the carriers agree with the city that the city's costs are above the presumptive level, the safe harbor, the 270? Well, that's a good question because the FCC basically is declaring that fees above cost are prohibitory. So I'm not sure that they can. But let's suppose the city said, let's suppose the city of Los Angeles said to the major carriers Verizon, AT&T, T-Mobile, and Sprint, our costs are really $400, we'll open the books and show you. And they said, no, that's okay, we'll negotiate with you. Can they agree that it's going to be $400? They should be able to agree. The FCC's order calls that into question because, as you know from the record, there are hundreds of these contracts in place. So the FCC's theory is that the reason that we're not going to allow costs above a certain level and anything above cost is prohibited and preempted is because the theory is that the carriers could then take that money and invest in rural areas, other cities, and so forth. So if the city of Los Angeles agrees to $400, and the city says it's $400, it's our costs, and the carriers all agree because they're very anxious to get into Los Angeles immediately, and the city of Fresno comes and says, we don't think it's above $300, does the city of Fresno have the right to bring an action because these carriers are being slow to develop 5G in Fresno? No, in fact, that's one of the flaws with the basic flaw in this whole cross-subsidy argument because that's what this really is, is that carriers will take money saved in Los Angeles and invest it in an area that's not now profitable, right? There's no economic theory that supports that idea. The whole universal service fund is based on the idea that a rational investor will make money where they can make money, and then they don't take good money and pour it into an area where it's not profitable out of the goodness of their heart. That's why we actually have evidence where Lincoln, Nebraska dropped the fee to $95 and said all you have to do is build out these less profitable areas, and they got no takers. There's no evidence of cross-subsidy actually results in the effects the FCC has, and certainly the FCC doesn't require it, and it doesn't give anyone any enforceable right to say, if you're saving money in LA, you've got to come to our community. One of the FCC's arguments is that they can aggregate the fees above costs. Are you taking issue with the aggregation mechanism, or are you agreeing that aggregation is permissible and just in this case it doesn't work? I take issue with the authority of the commission to do an aggregation at all, but I also think the aggregation method was flawed. What's your basis for that first point? The reason the first point is the structure of the act is to preserve local zoning authority, and it's really easy to see, and by the way, I just want to emphasize, 332 is the only provision that applies to decisions regarding the placement of wireless facilities. The FCC made an error in saying otherwise. But under 332C, it's pretty clear that what Congress was contemplating was a localized determination on a case-by-case basis of placement of facilities. And I think it's hard to imagine that in that context, Congress would have intended effective prohibition to not be equally focused on the local impact as opposed to an assumed national impact. And I also think it's very hard to say that if Los Angeles does X, it's going to, in fact, have a butterfly effect that's not just possible as opposed to actual. And you can see that in our brief when we talk about the fact that, in fact, where the money is going is in stock buybacks and things like that. So I don't think it's intended, and given the structure of localism and local decision-making, to allow those aggregate effects to be considered except in exceptional circumstances. It's not irrational for the commission to say, look, if we just open this up to competition, just let L.A. charge whatever the market will bear, because L.A. is a big community. They clearly will pay more there. And therefore, clearly, they will not have money to invest someplace else. Now, that doesn't tell us that if they have the money, they will invest it. They might just up their profits. They might do something different. But it's not irrational to think that if L.A. is charging $1,000 per poll, that there isn't money to go to Fresno. Well, it actually is a little bit irrational in this sense. One of the reasons New York people will pay more to be in New York or in Los Angeles is because they can make more money. You can't just look at cost divorced from revenues. That's a basic economic principle. And if what's happening is a carrier is actually earning a reasonable return in Los Angeles, it shouldn't affect their ability to go into any other market that's also a viable market. The idea that you spend more and the idea that in a competitive market, if you spend more to go to a place that's more valuable to you, it somehow prevents you from going somewhere else seems to me a little bit of a stretch. You're saying that you don't agree with their economic theory. Can we say that? I think you can because even when we're dealing with, and this is something like a predictive judgment, even when predictive judgments are given, particularly on economic issues, and particularly under your interpretation that an actual prohibition is required, I think the case law would suggest there has to be sound economic theory supporting what's done. And I don't think there is. I would like to reserve the remainder of my time if I could, unless the panel has any additional questions they'd like to ask at this point. Thank you. Thank you. May it please the court. Sean Stokes on behalf of Petitioner American Public Power Association. With the court's permission, I'd like to address the FCC's improper assertion of regulatory authority over attachments owned by public power utilities, that is government-owned electric utilities, despite Congress's expressed withholding of such authority in Section 224 of the Communications Act. Now, it's axiomatic that the FCC only has that authority that's granted to it under the Communications Act, and the only grant of authority over electric utility poles in the Communications Act is found in Section 224. And Section 224 explicitly denies the FCC's authority with respect to public power utility poles. Now, it's helpful to very briefly go through the history of how this came about. In 1997, when cable was the nascent industry, the FCC looked hard to see whether it had authority to regulate attachments to electric utility poles, and it found it did not have such authority. In 1978, in response to that, Congress enacted Section 224 of the Act. Section 224 grants the FCC authority to regulate rates, terms, and conditions by cable companies at that time to electric utility poles. Importantly, however, the FCC was explicitly denied authority with respect to public power utilities and electric co-ops. In 1996, as part of the Telecommunications Act, Congress amended Section 224 to expand the scope of it to telecommunications carriers as well as cable operators, and it also provided for access to such poles. Importantly, however, despite that expansion, Congress maintained and preserved the withholding of authority for electric co-ops and public power utilities. Significantly, at the very same time as Congress enacted those amendments to Section 224, it also adopted Section 253 of the Act as well as the amendment to Section 332C7, neither of which address access to local government facilities. Now, in the 20 years plus that Section 253 has been in place, the FCC has never once suggested that it has authority over public power utility facilities. In fact, it specifically has rivaled at its lack of authority. In the record, we point out in the National Broadband Plan that the FCC bemoaned the fact that it did not have authority over all poles in the country, and specifically requested that Congress amend Section 224 in order to, in its words, develop a uniform regulatory regime to give it power over all poles. So now what we have is an abrupt regulatory U-turn. The FCC has held that it does actually have such authority, and it's been laying hidden and dormant in Section 253 for the last quarter of a century. In a single footnote, the FCC brushes aside arguments made about Section 224 without elaboration and also no meaningful statutory analysis. Specifically, they argue that Section 253 is an independent source of authority with respect to the very same poles that Section 224 expressly prohibits. Why isn't it a separate source of authority? Why is 253 not a separate source of authority? Well, for two reasons. One, given the fact that 253 on its face only addresses government entities acting at a regulatory capacity and deals with state laws and regulations and legal requirements that are imposed at a regulatory capacity, and it doesn't in any way address access to facilities, it seems odd that the very same law that does not speak with respect to public power utilities or indeed any government facilities would be presumed to give them this authority when Section 224 in the very same title of that act, which is also amended at the very same time, would deny the FCC authority over Section 224. The reason 224 that you're focused on is C-1 or F-1? Your Honor, it's actually kind of the definition. Basically, it defines utilities as not including utilities owned by government entities. Okay. So that just applies to where the term utility appears. So if I look at C-1, this is actually an actual prohibition on what the commission can do and says the commission does not have jurisdiction with respect to rates, terms, and conditions with respect to poles for pole attachments in any case where such matters are regulated by the state. That suggests that the FCC might have jurisdiction to regulate such things if the state is not regulating itself. Am I misreading that? I believe what that is saying, Your Honor, is that the assumption is that the FCC has regulatory authority over utilities for governing attachments, and the section that you're talking about is a carve-out. Well, it's actually an ability for states to opt out of the FCC's pole attachment authority by reverse preempting and saying we actually regulate electric utilities of this type on our own. For example, California has done so. The California Public Utility Commission regulates private investor-owned electric utilities, and therefore the FCC's Section 224 pole attachment authority does not apply to that. What I'm saying is with respect to electric co-ops and public power utilities, meaning government-owned utilities, Congress wrote it so that that section doesn't apply at all. In fact, it specifically says that they are not the type of utility that is even subject to any FCC pole attachment authority, irrespective. The word utility doesn't appear in 253. Correct. I would absolutely agree with that. It doesn't say anything about facilities or utilities at all. So how do you get the 224 restriction on 253 if the word utility doesn't appear in 253? What I would say is that under canons of statutory construction, the specific controls the general, and Section 253 is certainly only a general statement of authority to the FCC, and Section 224 is a specific prohibition. Isn't it more that they're just different? It's not specific general. It's just two different types of regulation, two different types of statutes. Well, I would say there are two different types of statutes also in the sense that Section 253 is clearly aimed at when a governmental entity, state or local, is acting to somehow impede through regulatory activities, and that gets to my second point of what the Commission did, irrespective of what Section 224 says, is that the FCC misapplied the market participant doctrine, which this Court has found to be applicable to Section 253 and has generally found to be applicable. The market participant doctrine under Boston Harbor and its progeny is that the presumption is that when a state and local government entity is, unless the statute says otherwise, that they are presumed to have the ability to act in a proprietary capacity as long as such conduct is analogous to the way that other private entities would act in that case. And we would argue that's exactly what, at least with respect to electric utilities, how they own and operate their public, their utility poles. The FCC has flipped that, and in fact, what they've said is that they find that a government activity is not protected unless the statute, quote, carves out an exception for proprietary activities. That's simply not what the Boston Harbor market participant test says. I see that I'm about two minutes, and I'd like to reserve time, so if there's no further questions. Thank you. Thank you. May it please the Court, I'm Eric Adding, and I'm going to be discussing the radio frequency or RF issue, and I'd like to reserve one minute. Montgomery County's concern is what the FCC has yet to say. In response to rulemaking comments that the FCC's RF exposure standards may not reflect the current safety research or account for this new 5G environment that we're going to see in the coming years, and that the FCC must resolve those issues before accelerating the siting and the operation of these 5G small cells on public rights-of-way, the FCC offered a single sentence. It said it disagreed with any concerns that Montgomery County or others have. I guess the issue which has been raised in the 28J letters is mootness, given the completion of this rulemaking which had begun much earlier, so why don't you address that? So the burden in this Court is heavy on the FCC. It has to show that there's no possible way for this Court to give any relief. And so in our case, we're asking the FCC to explain in the context of this order why RF is either irrelevant or why it thinks it's important and how it's going to resolve this issue. Well, why shouldn't you now? I mean, your complaint originally in the briefs was that the FCC should have completed this rulemaking during the tenancy of this appeal. They have now done that. And so why would you not raise any challenges you have to that rulemaking in a separate petition? I would just agree that they have done that. They've done two things in those six pages where they close out the NOI. They talk about cell phones, which are not small cells, and then they have some conclusory statements that the record doesn't show that they need to update these RF standards. But nowhere in those six pages do they ever discuss the 5G environment. They don't discuss densification. They don't discuss the use of millimeter waves. That may be, but why wouldn't the appropriate process here be for Montgomery County to now challenge that other rulemaking? Because the thrust of the argument initially was they just haven't completed the rulemaking, but now they've completed it. So you may have good arguments against that rulemaking, but how do we dispose of them in this case? Because we didn't get the relief if we have to go back to court and take another year to litigate this. We're not getting the relief that we want because it's our position that they actually haven't addressed the issue. Montgomery County wants to be able to tell its citizens it's putting these 5G small cells on its property. And the citizens are asking, is this safe? Can we walk on our sidewalks? And if we have to go back and litigate for another year, that's a year that the carriers and the FCC is allowing these to be deployed. And so we have the evidence in the record showing that these may be dangerous, maybe they're not. But we don't have the answer to that question. We don't have the later action before us. But they've raised the mootness issue, so I think the court now has the obligation to decide it. But I think on its face, I don't think the court has to do a lot of work. No, we have to review the merits. No, no, no. You're really disagreeing with the merits of this. No, we're not disagreeing with the merits. I think on its face, they didn't address this issue. I don't think the court needs to dig into the record or anything. I think on its face, it literally decided not to address the issue that we asked, which was to clarify, is this a potential risk or isn't it? And so we can go back to our citizens and we can take whatever steps we need to take to deal with these new small cells. And so I think in the context, I think our case is rather simple. It's kind of an APA case. In this order, our order, not the one we were just talking about, they don't explain their decision. They had a single sentence, despite the fact that you have this huge record of concern, of studies, of research. So, counsel, in the other matter, the matter that's closed, is that subject to appeal? Have you taken a notice of appeal on that one? Yeah. Is that pending? Where is that pending? So there are two cases, one here in the ninth that I know of, one here in the ninth and one in the D.C. Circuit. Are they going to be consolidated? Yes, I think under 21, was it 21-12? Yes, they'd be consolidated. Do you know where they're going to be consolidated? I think D.C. won the race to the courthouse. And when are those going to be heard? We don't know yet. They were just filed. So, I see I have one more minute left, and I'd like to reserve that for Amy Roboto. Thank you. Good morning, Your Honors, and may it please the Court. I'm Scott Novick for the FCC in the United States, and I'll be addressing the main effective prohibition issues. And especially how that language applies to moratoria, fees, and aesthetic requirements. My colleague, Ms. Citrin, will then address the remaining issues. At the outset, I think it's important to set down a marker here, which is that I don't think that Mr. Van Eaton has accurately represented the orders on review here today in any number of respects. The parade of horribles that were raised on the earlier arguments won't happen under these orders, or at least there's no reason to think those parade of horribles will happen on a facial challenge here. The orders here address each issue in a flexible manner with a number of guardrails and mechanisms that are capable of addressing all of the alleged harms here on a case-by-case basis. Since we're in Pasadena, and you referred to the parade of horribles, let me ask you specifically about the example of the Pasadena Rose Parade and the moratoria. Yes. So the moratoria order here doesn't say, and I think this was not represented accurately in the brief either, it doesn't say that all moratoria are necessarily preempted. What the moratoria order says is that moratoria violates Section 253A, and that makes them potentially subject to preemption. But it then says that moratoria will be saved from preemption and will be allowed if they meet the terms Congress set forth in Sections 253B or 253C. So specifically with respect to that Rose Bowl Parade question, the order says in Paragraphs 160 that under Section 253C, rights of way management, which would be saved from preemption, may include issues such as coordinating construction schedules. And as I understand that hypothetical, if there's other construction that needs to take place along the parade route, then I think the terms would likely be satisfied there, that a moratoria on wireless construction to facilitate that other construction would apply. And there was also the issue raised of hurricanes, for example. So Section 253B says that localities are authorized to take these steps if they're necessary to protect the public safety and welfare. And we explained in the order, that will address situations like natural disasters. And with respect to, I think, the opening issue here about some of, for instance, the poles outside of the courthouse. So the moratoria order doesn't purport to preclude localities from addressing reasonable aesthetic requirements. In fact, we say in the small cell order that aesthetic requirements are permitted. And we don't limit the subject of them. We simply impose the modest procedural constraints. So these poles, if the poles aren't capable of supporting a small cell, then it may be the poles need to be replaced. But a locality could require the pole to be replaced with a pole that's similar in character to the existing pole or the surrounding neighborhood. I think you could say that if a new pole needs to go up, that in a downtown area, if a 50-foot pole would be out of character with the surrounding neighborhood, you can't put up a 50-foot pole. The objection to the aesthetic regulation was that it was objective. And if you've imposed a requirement that there be objective criteria, then how do you get one that blends in with the neighborhood? So I think the petitioners are taking the word objective out of context. I think it's clear from this order that when the commission used the word objective, it meant objectively ascertainable. It meant not unduly vague. If you take a look at footnote 246 of the order, it points out that many state small cell bills that this order was modeled after use objective for this. Now the order specifically – Which footnote? Oh, sorry. Footnote 246 points to many different state small cell bills that impose this identical requirement. And there's been no indication the sky is falling in those states. But the order specifically says that you can require, and this is paragraph 87, that aesthetic restrictions can be directed to avoiding or remedying the intangible public harm of unsightly or out-of-character deployments. So the order specifically says those requirements can be imposed. I guess the petitioner's objection to this, I think, is that there may be an acknowledgment that certain aesthetic requirements effectively prohibit, but the effect of the order is to have a fairly dramatic influence against cities and towns all over the circuit, all over the country, really, and what they may be able to do in very unique localized settings. And so maybe you can address that. Sure. So let me take that first with respect to aesthetics, and then if we want to examine the other issues, I'm happy to do so. So with respect to aesthetics, I think what the order did here was very modest. It didn't stop localities from regulating aesthetics. It didn't tell them what aesthetic requirements they can or can't have. Localities are still free to adopt and craft their own substantive aesthetic requirements. All the order does is recognize some modest procedural constraints. It says that whatever aesthetic requirements a locality adopts, they must be technically feasible, nondiscriminatory, and disclosed in advance. And those are very modest requirements, but they are very important. The record here shows. For those three requirements, how does that function affect? Is a city preempted from issuing any aesthetic requirements unless it does that in advance? So, Your Honor, let me first say, directed to one of your earlier questions, that these orders are not self-enforcing. They contemplate the need in many circumstances for further case-by-case adjudication. And in those instances, either someone has to come back to the commission or go into court. Okay, so let's talk about the first one. So how do you get it before the commission? I'm going to have these questions with respect to the cost in just a minute. Yes. So Section 253D specifically authorizes the commission upon a request from private parties to preempt a state law that doesn't comply with Section 253C. That's after noticing an opportunity for comment. Yes. So when we conduct those proceedings, what ordinarily happens is a party comes to the commission. This, I believe, is what happened in California Payphone. Came to the commission, and in that case it was service providers, saying that here are some local requirements that we believe are prohibiting us from providing service. Can you declare in an order that these are preempted? And that's an opportunity for case-by-case adjudication that occurs there. When we do that, yes. And you issue notice and opportunity for public comment? Yes. Any petitions that come to us we are putting out for public comment. I'm not following this. I live in Arizona. We have a lot of polls that look like cactus. If the city of Scottsdale were to have a requirement that all of these polls have to look like cactus, and somebody didn't like it, what would they do? Well, so first of all, let me just say the order specifically speaks to camouflaging. I think that's the lens we look through it, and it does acknowledge that camouflaging wireless facilities imposes some burdens on carriers, but says those are permissible. How does this work? I don't understand how you get a notice and comment. On what? So nothing in this order is self-enforcing. So what would happen in that scenario, I think, is that the locality would prohibit this sort of construction from taking place, and then the carrier would have to come either to the commission or go to court, either under Section 332 for wireless facilities provides a private right of action, or I believe every CERC to consider this has said that there are circumstances where a challenge can be brought under Section 253 under the Supremacy Clause. So any one of these specific factual disputes that arise, this order is designed to provide some clarity and narrow the scope of disputes, and we hope that's going to reduce the number of situations where parties wind up at loggerheads and disputes arise, but when there are remaining disputes, nothing about this order is self-enforcing. So if somebody doesn't like the restrictions placed in the city of Scottsdale, they come before the commission under 253D? Under 253D. And then the commission has to issue notice and comment? Yes. On what? On the petition. So we frequently get petitions from private parties seeking declaratory rulings on various matters. So our normal process for those is we issue a public notice, putting the world on notice that these disputes are before us and seeking comment from private parties. Is it treated as an adjudication or is it treated as a rulemaking? It's generally treated as an adjudication, Your Honor. So somebody wants to build something that looks like a tree. You have a public notice and comment on whether they should be able to build something that looks like a tree when there's an ordinance that says it has to look like a cactus? Yes, Your Honor. Well, the question, of course, would be whether that requirement fits the terms of this order here, whether that's a reasonable aesthetic requirement. So when disputes arise, that would happen. Or, of course, I do think in most circumstances, given that the commission process is, by Congress's requirement, a little bit slower because we have to accept comment and solicit comment from all interested parties. It does happen when you have a narrow dispute between a particular locality and a particular carrier. Usually they will go to court, and, of course, Section 332 for disputes over wireless infrastructure, which is most of what we're talking about, not only provides that mechanism, it specifically directs the court to consider those on an expedited basis. And that's what's been happening all over the country for wireless siting for most of the two decades since the sprint telephony came out. The commission handles it? Who does it get filed for before the FCC? Your Honor, I... A particular bureau that handles this? So, you know, I think they would likely go to the... If they were wireless, we have a wireless telecommunications bureau, and if they were wireline facilities, and here the only thing that applies to those wireline facilities is the moratorium order, that would go probably to our wireline competition bureau. But in any event, if these were filed with the commission, they would be routed to the appropriate staff within the commission. May I ask you, one of the requirements of this small-cell order is that the aesthetic requirement be no more burdensome. I think that's the language. No more burdensome than those applied to other types of infrastructure deployments. How is that... How do you align that with the statute's reference to unreasonably discriminate, which sort of suggests that some amount of discrimination as compared to other infrastructure may actually be reasonable? I think it would be no more burdensome than what applies to similarly situated infrastructure. So if there were infrastructure for a different type of utility, that there was reason to think it's not similarly situated to wireless infrastructure, then I don't think they would prevail under that. But again, when those disputes arise, if the parties really can't find sufficient certainty in this order, they still disagree on what the resolution of that dispute is, that's going to have to be put before some adjudicator to address it. And there's going to be someone interposed to address those case-by-case issues. That's fair, but the... I guess the other side has raised this point that when you just compare the standards, the one in the small-cell order as compared to the one in the statute, there is some possible misalignment, right, where it says no more burdensome, which would suggest parity, whereas the statute suggests actually there's some amount of discrimination that would be allowed. Again, I think it's meant in the order to just parry among similarly situated infrastructure, which I think brings us into alignment. What does that mean? Well, so, for instance, a problem you have here sometimes is you have times when you have, say, cable equipment or electrical equipment, and what the record shows is that in many localities they were imposing very burdensome requirements on wireless equipment that might be smaller and less, more unobtrusive than similar equipment you might see on a utility pole or on a pole that was being used to provide cable service, that was being used to provide electrical service, but for whatever reasons, localities were subjecting the wireless carriers to far more onerous requirements. So the nondiscrimination principle here is just saying that if you are claiming that small cells need to meet some burdensome aesthetic requirements, but you're allowing other utilities to put larger, uglier, blighted infrastructure on the same poles, it's hard to think that this is a legitimate aesthetic requirement you're imposing, and, you know, sometimes these are being imposed for ulterior reasons, and sometimes it's just the fact that localities have laws that were written in the era of large macro towers, and they frequently have very burdensome requirements that were designed for those large macro towers that don't make sense when applied to small cells, and many jurisdictions, many states, have updated their laws to be able to address small cells. Part of the problem here, though, is that in many jurisdictions you have outdated, ossified laws that don't address the type of equipment that's at issue here, and that is obstructing the deployment of desperately needed improved wireless networks. Is that clear in the order? Your Honor, I think it's clear. That this is really aimed at outdated structures. Well, the order here is, does not take a position on what the reasons are that localities may be having these requirements, so the order acknowledges up front, many localities have taken measures to streamline the deployment of infrastructure as we move towards small cells and to 5G networks. Some haven't, and we're not trying to cast any aspersions on what the motives are. What I'm suggesting is there may be many instances where there's not a improper motive going on here, but there's nonetheless a problem, and under Chevron here, our responsibility as an agency was to look at the record, and the record here showed there were real problems, there were real impediments in these four specific areas to the pressing public need to facilitate wireless deployment and have improved networks, and whatever the reasons for those are is, I think, not relevant here. The fact of the matter is the record shows there were severe burdens being placed that were prohibiting the government and carriers from fulfilling the needs of modern communications networks nationwide. I want to make sure you have a chance to address the fee issue. Yes. The other side has raised the point, essentially, that under the FCC's approach, even a locality that charges $1 above cost would fall prey to this order, and that the $1 really wouldn't effectively prohibit wireless development. How do you respond to that? I think there are a few different things to support that aspect of the order. One, of course, as Your Honor pointed to earlier, is this aggregation issue, and the small-cell order is only about small cells, and the problem is that fees that might otherwise seem small in isolation, they're usually a few hundred dollars, sometimes a few thousand dollars, when you consider them in the aggregate, those per-site fees are multiplied across the vast number of coordinated small cells you need to provide service. If you need 100 small cells to provide service in a town or just part of a city, a fee of a few hundred dollars can quickly become tens or hundreds of thousands of dollars per year, and that might just be one city. You also have to consider the effect if every other city were to start demanding similar fees. So Portland might think that its additional fees aren't all that much, but if every other city in Oregon were making similar demands, or every other city nationwide, this is prohibitive, and I think this brings us to... So how did you get to 270? Well, Your Honor... Paragraph 79, footnote 233 is the only thing I can find, and I don't see much data there. So, Your Honor, let me clarify. There's another issue I think that was misrepresented here earlier. That 270 is simply a safe harbor. It's not a cap. There's no limit at 270. All right, so AT&T can come to the city of Los Angeles, the city of L.A., can say, we've got the numbers if you want to see them, but it's $400 a poll. Yes, Your Honor. I'd point you to paragraph 32 of the order. It says, it is the standard itself, not the particular presumptive fee levels, that ultimately will govern. The safe harbor here was just recognizing that... How do you prevent an auction from occurring? If AT&T gets there first and says, we want all these polls, and we'll pay $400 a poll, and L.A. says, gee, that's probably our cost, and it's not, does Verizon have a right to bring an action? No, Your Honor. I don't think that anything would give Verizon a right to bring an action there. Does NO have the right to bring an action? Because now AT&T is spending a whole lot more money in L.A. than above cost, and therefore they don't have money to put the 5G network in Fresno? That's the FCC's theory. Well, if a carrier agrees to go in and pay above cost, there's nothing that precludes them from doing so. That is up to the carriers. It may be that the carriers, there may be some disagreement on what the costs are, but to avoid litigation... But carriers can pay above cost. Yeah, absolutely. So although the commission's rule treats the safe harbor for polls as polls is fungible, if somebody thought that going down the middle of Orange Grove was better than going down Grand Avenue, which is the avenue right here, then you might end up with a bidding, with an auction between two carriers. Well, so I... As long as they agree. You know, I think that there's no evidence in the record here there are those sorts of capacity constraints at issue. I mean, if you have, you go down the road and there are a series of streetlights up and down the road, and these small cells, while they have much less range than macro towers, they have a fair range. And so there's no reason to think, I think, generally, that we're dealing with conditions of scarcity here. No one has suggested that. I don't think anything in the record demonstrates that. So I don't think you're in that sort of situation. But I do want to stress again, nothing in this order... I'd like you to get to how you got to the 270. So, Your Honor, what I believe happened is that the commission took a look at various state small cell bills. And it's interesting, counsel, that you just characterized it as you believe, because there isn't anything in this record that tells us what the commission did, other than look at bills that were appended in a number of states, mostly in the heartland, not on the coast. So I want to try to answer that, but I just want to say to preface that, that this is just a safe harbor. And this order would have been perfectly reasonable, even without any safe harbor at all. What do you mean safe harbor? What do you mean? You mean that if it's below that, there's no problem with it?  was recognizing that there exists a certain level of fees below which the fees are so likely to pass muster, they're so likely to be within what the actual costs are, that it wouldn't make sense to be expending resources on litigating those. So the safe harbor says that even if there might be a dispute at those low levels as to what the appropriate fees are, at that point, the localities can do them. This avoids the need for burdensome litigation in those circumstances. But nothing at all precludes localities from charging higher fees where the costs are higher. Does the commission have an obligation to explain why it chose 270 as opposed to, let's say, 250 or 300? Well, I do think that at that point, you're in the area of paradigmatic line drawing, where agencies, I think, are at their greatest effort. They've chosen 200 or 400. That's significant, isn't it? Your Honor, I don't think that this was something that we were able to calculate with mathematical precision. I mean, if you calculate it with mathematical approximation. I don't even see the approximation. So what the commission did here... The numbers that are in the bills that the commission relied on in footnote 233 are in the range of about $100. So the 270 appears... I mean, it may be generous for the cities, and maybe it was out of an abundance of caution. I'm just trying to figure out whether they just drew a number out of a hat, which might make it arbitrary and capricious. Again, it may be city-favorable. I do think it was out of an abundance of caution. I think that given what evidence was in the record, and of course we are reliant on what evidence is in the record here. There were notices of proposed rulemaking here. There was abundant comment from any number of parties. Were there any numbers in the record other than the bills that were pending in state legislatures? I don't think that all of those were bills necessarily pending in state legislatures. Most of those were enacted bills. You're citing bills. I couldn't tell that they were enacted. Well, I apologize for that, Your Honor, and I don't have the exact footnote numbers in front of me that were pointing to those. I'm not, unfortunately at the moment, able to direct Your Honor to them. He said many different states' small-cell bills adopt similar small fees, and I don't know whether that means that they were adopted or not adopted. I can't tell from the footnote, but that's the only evidence that you've got for the 270 is one footnote. Your Honor, we have to go with what evidence is available in the record, and again, I'm going to point back to the fact that we could have had this order with no safe harbor whatsoever, and that would have been perfectly fine, just saying whatever the costs are, it's the cost. So even if there's some question about where that safe harbor was set, I'm not sure that could invalidate the whole order. It could invalidate the safe harbor, which I don't think would offer any relief to the petitioners here. So I don't see any way in which you could bootstrap any questions about the safe harbor to invalidate the underlying standard here, which would say that fees can't exceed a reasonable approximation of the locality's actual costs. I think that our submission here is that when localities are demanding fees that exceed any reasonable approximation of the actual cost they have to incur, those unnecessary fees are having the effect of reducing deployment and thereby reducing service. When you increase the cost of deployment, you are going to get less service. You're making it a less attractive investment, so the commission found carriers will do less deployment, and the reduction in wireless infrastructure means a reduction in wireless service. And I just want to point out... We've let you go conservatively over. I do want to just see if any of our colleagues have other questions for you. Thank you, counsel. Thank you, Your Honor. Good morning. Good morning, and may it please the Court. I'm Sarah Citrin for the FCC in the United States, and I'm here to address claims of the APPA in Montgomery County. Turning first to the claim that government-owned utility poles are categorically immune from the reach of federal preemption, there's nothing unreasonable or novel about the commission's determination that the statute doesn't provide that exemption, and it's for the reasons that I think the questions from the bench reflect. There's no dispute that restrictions on access to these poles can prevent the provision of service, and the petitioners haven't pointed to anything in the text of 253 or 332 that would carve these poles out. They're asking you to infer that exemption from the definition of utility in Section 224, which is expressly limited in the text of the statute to this section. So what is the relationship, if any, between those two sections, 224 and 253? They address different topics, Your Honor, and Section 253 and 332 require the commission to find a prohibition in order to have anything to say about the rates, terms, and conditions of these government-owned poles, whereas 224, the separate regime for investor-owned poles, doesn't have the same requirements. And I'd like to be clear also that the commission has not, in any previous material, the petitioners are pointing to the National Broadband Plan, for example, which is a staff-level document not binding on the commission in any event, but most of those materials cited reflect recognition that 224 doesn't provide this kind of authority, and that's not what the commission has claimed here. We're operating under the preemptive authority of 253 and 332. So does this sort of depend on how you characterize what the FCC has done here, whether it seems like it's more of a regulation under 253 or 224? I don't think so, Your Honor. Even it would be possible to view them as mirror-image regimes. I just think that 224 doesn't... 224 is a regime for investor-owned poles that the commission is not operating to pursue in here, and there's no reason, and certainly there can be no claim that 224 unambiguously reflects that kind of exemption. I think opposing counsel said it seems odd, but seems odd, of course, is not the standard. It was reasonable for the commission to recognize that the statute here does not present that kind of exemption. Turning to Montgomery County's claims, there's simply no need for the court to reach them at this point in light of the radiofrequency order released in December, which is under appeal separately in this court and before the D.C. Circuit. Is there no further questions? Who's going to address the interpretation of our decision in Sprint? Well, I think... I'm happy to address it briefly. I'll say that our view is that the... the petitioners are arguing that there was a finding by this court in Sprint that there was an unambiguous... forecloses the commission's interpretation of effective prohibition in this case, and that's not true. What the court did in Sprint was recognize that there had been an error before in interposing the term may prohibit. The commission concedes that there has to be an actual effective prohibition. The question for the court is, what is an effective prohibition? And nothing in Sprint forecloses the commission's reading. If there's no further questions, I'll ask that the court uphold the commission's order. Thank you. Good morning, Your Honors. Joshua Turner on behalf of CTIA and the industry intervenors. And I'd like to offer a couple of thoughts here. I mean, first I'd like to talk about this court's decision in Sprint, which the other side relies on heavily. Their argument is this is the Chevron Step 1 case and that this court has decided that Section 253 is unambiguous. I think that is a massive overreading of the precedent in Sprint. As co-counsel said, that case was narrowly tailored to address a specific grammatical issue that had arisen and caused all sorts of problems in various courts around the country. This court looked at it and said, we didn't mean to intend that any potential prohibition, right? It was being used to strike down zoning ordinances that gave discretion to municipalities to make decisions. And this court said, that's not what we had in mind. We didn't mean to clip the wings of discretion of all local jurisdictions. We wanted to make sure that any prohibition that was being preempted was an actual or effective prohibition. So that's the first piece. The second piece is Sprint cites California Payphone, which is the standard that the FCC adopts here, right? The material inhibition standard. And so there's no doubt in my mind, and I think there's no fair reading of Sprint that says California Payphone is outside the bounds of what Sprint had in mind, excuse me, when the en banc court decided it. I'd also like to talk a little bit about access to the courthouse and access to the FCC. I know this is an issue that was troubling your honors. As someone who practices in this area fairly regularly, let me just say as a practical matter, what will happen in these circumstances is if a local jurisdiction imposes a fee that is in our view, in the carrier's view, above cost, we will either leave and not build small cell facilities, or we will try and negotiate with the local jurisdiction to come to an agreement. And if we can't, ultimately, they're the ones that hold the keys to issuing the permits and to giving us access to the rights of way. If they decide not to do that, decide not to allow us to build, it's our obligation to go to court and to take them to court and say, the fees that you're imposing are outside the law, right? They're preempted by Section 253. And so what's your cause of action? So the cause of action... The supremacy clause, the declaratory judgment? The cause of action, yeah, for Section 332, there's a specific cause of action in the statute, Section 332C7B5. For Section 253, the way that courts have generally treated that, there was some dispute early on about whether or not there was a private cause of action in Section 253, but where the courts have landed, particularly post-Armstrong at the Supreme Court, is that it's a supremacy clause action that you bring under Ex parte Young. So you would go in and you would say, if you take this action, you're going to be violating federal law, I want an injunction against you doing that. The other point that I think is important to keep in mind... To the city officials? To the city officials, yeah. Can you speak to the fees? Because the other side, I think, has made the argument that we can say any amount of fee, especially in the aggregate, is an effective prohibition. So what is the limiting principle on this? Or are you saying there actually doesn't need to be one? Well, I think what the Commission says in the order and in its brief, it makes a very sort of trenchant observation, right? Which is that if you are charging any amount above the amount of cost recovery, if you as a local jurisdiction are charging any amount above the amount of cost recovery, what that is is a pure economic barrier to entry. That amount above the amount that you're charging to recover your cost is only serving to deter people from coming in and spending money and investing in your community. And so what the FCC says here... Is it an effective prohibition? Any fee is a deterrent to some extent? The statute says effective prohibition, so is it that? Yes, I think it is, Your Honor. I think what the Commission said here is interpreting the material inhibition standard from California Payphone and looking at it in the aggregate across all jurisdictions across the country, which is something the FCC is uniquely positioned to do. These kinds of things can't come up in normal litigation. It's very difficult to make an argument of sort of national effect in an individual litigation against a particular city because you get into all sorts of national-level discovery and then you have problems of showing, you know, aggregate effects across the entire footprint. So the FCC is uniquely positioned to take that into account and to look at the kinds of effects that will happen if you allow all municipalities to charge more than their costs for siting wireless facilities. And that's what the Commission did here, right? It looked at the Guayanilla decision from the First Circuit, which was, I think, the seminal case that sort of recognized this proposition, and it said, yes, that's right. We need to take a look at the evidence that's in the record. We need to solicit notice and comment nationally from people who are affected across the country, and we need to make a rule that encapsulates our view, our policy view about what the right line to draw is between prohibition and cost recovery. Thank you, Mr. Turner. Thank you. Could I just ask what is your take on the controversy over the aesthetic regulation? Well, Your Honor, I would tend to agree with FCC counsel that what has happened here is the FCC has laid down a fairly modest marker about what aesthetic regulation should be, and the goal of the order generally and of the aesthetic regulation specifically is to decrease the number of conflicts that we have that ultimately lead to litigation, because the litigation is time-consuming and expensive and ultimately doesn't benefit anyone. And so hopefully what the FCC has done here by saying we need to have objective, easily ascertainable standards is made those standards available so that both the carriers and the municipalities can understand what the rules are in advance and so that we don't have to end up in court. And I take it that the justification of avoiding litigation would be an argument in support of the 270 limitations. Yes, Your Honor, and that's an important point, too, because the kinds of cases that we're talking about here, and I've been involved in several of them, despite the expedited treatment that's directed under Section 332, they can last three to five years and they can cost hundreds of thousands of dollars to resolve. And when you're talking about thousands and thousands of small cells being deployed across the country, it's simply not tenable to have those fights in every single circumstance. And so it's really welcome to have the FCC come in and say at a certain amount, we're going to presume that it's okay. We don't think it makes sense to litigate over this and everyone should be fine with $270. And in fact, our members have seen, since the order has gone into place, a tremendous increase in the number of cities that are opting into that, and a tremendous decrease in the amount of deployment costs that we're seeing nationwide. And so we think the order is working precisely as intended, although there are a lot of cities that are simply ignoring it and hoping that this appeal turns out in their favor. Okay, thank you very much. Thank you, Your Honor. Mr. Van Eten. Thank you. I'm going to run through a very quick list on this. Let me start with proprietary versus regulatory. The Boston Harbor case is very clear that the Constitution does not preempt localities except when they are acting in their regulatory authority. That's the basic rule of law. And so when the FCC says no, Congress had to be specific, they're actually reversing what Boston Harbor found was the law. And it creates an enormous Tenth Amendment and Fifth Amendment problem, as you can see from my illustration, with the streetlights. Essentially, what they're saying is, we can require you to take those streetlights and give them over to us, even if we don't want to. You'll have to respond to applications, you'll have to come up with standards. That's exactly the sort of thing that has been found, much lesser things than prints have been found to create a Tenth Amendment problem. And under the doctrine of avoidance, you would have to read the law to avoid that sort of problem, which is created by this order. The second thing I'd mention is, the counsel for the FCC said we're exaggerating things. So let me just go back to the moratorium example. At paragraph 145, they said that anything that prevents or suspends the permitting process is a violation of 253A. They said it in paragraph 151. They said we're not deciding anything in particular, but if you have this, it's a violation of 253A. Now, if that's what they've said, and that's meant to have the binding power of law, it's not a case where we can come in and challenge you on a case-by-case basis. They declared what the law is. Now, if all this was just guidance, it wouldn't be a problem. But it's not just guidance. They're purported to speak with the authority of law. And at paragraph 153, they said there would only be rare exceptions because management does not include the right to stop construction. So we can't even come in and say there's a reason why we stop construction because the FCC's interpreted the word management, which we don't think they have authority to do and certainly have no expertise, to mean when you're managing your rights of way, you can't stop construction for periods. So what the FCC sees is a generous order. When you look at what the findings of law are, it's actually pretty harsh. And the same thing is true with the reasonable aesthetics requirements. Council says we allow reasonable aesthetics requirements. Well, reasonable is defined as technically feasible. Okay? And we know from their discussion of the... we know from the intervener's brief that the intervener viewed that as meaning they get to install what they want and basically where they want, subject to only such minor adjustments as they can make without preventing them from doing that which they want to do. So it doesn't protect the city in terms of the replacement of the streetlights, and nor does their entire structure make sense from an arbitrary and capricious standpoint. Let's take the example of it just has to look like other utilities. Well, the streetlights are another utility. And if they can't make it look like a streetlight, they still get to remove it because the way this thing is set up is they don't actually have to comply with standards that are there for other electric utilities or anyone else because they always have this technical feasibility out. All right? It doesn't actually end up working the way the FCC is explaining it does. They've created too many holes in this. That's one of the reasons we're raising both Chevron 1 and Chevron 2 arguments. With respect to the fees, let me just be clear that the money they came up with comes into play in two ways. One is to create a safe harbor, but the other is it is the sole basis for finding that there's an effect of prohibition. And in the order, they say, we've done the examination. We think $100 or $270, those are the right amount. Those reflect city cost. They absolutely ignored the extensive data, and there's extensive material we submitted at LGER 366 to 459 that indicates that the cost of doing the sort of work that's required to accommodate a small cell is far greater than what they've estimated. Okay, so can you shed any light on footnote 233? Were these bills actually enacted, or were they just pending bills? Some of them were enacted, some of them weren't. I can't remember whether all the ones that were listed were enacted or not. The fees that are listed there, Arizona, Missouri, Arkansas, Delaware, are quite a bit less than the $270 fee that the submission came up with. That's correct. But remember, the purpose of the bill, the bill's never, this is, the commission assumes these were numbers that the communities came up with to estimate, the states came up with to estimate cost, but that's not the case. The numbers aren't supported by cost. The states didn't claim they were cost-based. Right. The states claimed they were intended. But the states haven't undervalued, they haven't gone below the cost. Oh, I'm sure they have, actually. I'm sure that the goal that's being sought here is to encourage deployment. I think they've made a policy choice that even if there's an additional cost, that's correct. You can't assume they're not subsidizing, because there is, we actually have an example, one of the ones that... Presumably, for example, the state of Arizona, which was going to charge, I think, $100 per poll, won't complain if they actually have to get $270 per poll. Well, they won't be able to get that, because they won't be able to go above the state law limit, but they wouldn't complain about it, no. Even with the State Department, that doesn't preempt the states? No. The federal law doesn't preempt the states. So in the states that have adopted a lower level, those levels stay in place. Okay. And what tells us that? I'm trying to remember where it is in the order. Or is this just simply a function of the fact that the cost can be negotiated? No, it's a function of the fact that the FCC safe harbor doesn't require you to charge the safe harbor. You can charge less than the safe harbor or nothing. It's simply an amount to which you can charge that would not be subject to challenge. But if you choose to charge less, it doesn't prevent you from doing that. What it prevents you from doing is actually either doing a cost-based... Basically, the problem really is the prohibition is found based on numbers that have nothing to do with cost, and the commission ignored the data in the record that indicated that costs were actually much higher. Can you tell us where the $270 number actually came up with? I'm not sure where the $270 came from. I think this is one of many unexplained points in the order. I'm... Mr. Bunning, your time is up. I want to see if anyone has other questions for you, though. May I just make one more point? Please do keep in mind that 332 and 253 are different. And when they're talking about discrimination, 332 only prohibits discrimination against functionally equivalent... providers of functionally equivalent services. So when they look at 253, they're actually ignoring the explicit limits of discrimination to 332. Thank you very much. I just want to briefly respond to a couple of things from the FCC. First of all, as my co-counsel, Mr. Van Eaton, indicated in the market participant doctrine, there has to be... there's a presumption that the government entity can continue to act in proprietary activity. The FCC found that everything in the record showed that, indeed, the state and local governments were acting to pursue regulatory objectives. That's simply not true. They ignored... They did not even mention any of our comments where we specifically pointed that, at least with respect to public power utilities, they own and maintain and manage access to their electric utility poles in a proprietary manner in exactly the same way as private other utilities and other entities with private structures within the right-of-way and outside the right-of-way. Second, I want to point out the fact that... that while the suggestion is that the FCC is not regulating these facilities by public power utilities in the same way that Section 224 does not allow because they're simply exercising oversight, but there's nothing in this order that suggests that the scope of it doesn't apply exactly to public power utilities. In other words, the public power utilities are also subject to the rate limits, the shot clocks, the timing, the moratorium, everything under that. That looks very much like a regulatory regime being put under the cover of oversight. And then the final thing I'll talk about is the parade of horribles. The problem is that with this presumption that these government entities are somehow acting in a regulatory context and subject, therefore, to Section 253, the FCC is saying, well, you can overcome it in particular instances. But they've already put the thumb on the scale. In fact, they've already told district courts, this is how we view this. This is how we believe you should view it. Let alone how the FCC has certainly indicated they intend to view this when someone brings one of these cases to them. We believe that if anything, then if you put the presumption back to where it should be, if some carrier can bring a case demonstrating that it actually is causing an impediment and is actually being undertaken for regulatory purposes, then maybe you can bring that case. But they flip that presumption and making us overcome it. And then the final thing, while I agree that probably they're not saying there's bad motives, the FCC goes out of its way to say, we're concerned that these entities will be utilizing claims of proprietary activities as a pretext to advance regulatory agendas and objectives. There certainly is no instance of that the way that electric utilities provide access to their poles. Thank you very much. Mr. Gotting, you have the final word. Yes. And it will be brief. In response to opposing counsel, I would just simply ask that the court require the FCC in the context of this order to respond to Montgomery County's comments as well as others and not force us into another lawsuit. Thank you. Thank you. I want to thank, on behalf of the panel, all counsel and all parties for their help in helping us work through these important issues. I think the briefs and the arguments are a testament to the amount of care and attention you've all put into this. So on behalf of the court, we thank you. We also thank you for working productively with our court staff to help schedule all this. Thank you again for that. So to the extent of the petitions for review challenging the moratorium and small sale orders, those matters are submitted, and we will now turn to the poll attachment issue.
judges: Schroeder, Bybee, Bress